# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PAUL BERGER, AS TRUSTEE FOR )
THE PAUL BERGER REVOCABLE )
TRUST and KEVIN BARNES, )
                                   )
            Plaintiffs, )
                                     )
         v. )    C.A. No. 2025-1183-BWD
                                     )
JAMES FOX, LUIS A. AGUILAR, )
GAYLE CROWELL, VALERIE )
MOSLEY, GREGORY SMITH, )
LAUREN TAYLOR WOLFE, )
BARBARA TURNER, and MORGAN )
STANLEY & CO. LLC, )
                                     )
            Defendants. )

## MEMORANDUM OPINION GRANTING MOTIONS TO DISMISS

Date Submitted: July 1, 2026
Date Decided: July 24, 2026

Kimberly A. Evans, Lindsay K. Faccenda, Daniel M. Baker, Robert Erikson, BLOCK & LEVITON LLP, Wilmington, DE; OF COUNSEL: Jason Leviton, BLOCK & LEVITON LLP, Boston, MA; Jeremy Friedman, David Tejtel, Alexander M. Krischik, Lindsay La Marca, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, NY; *Attorneys for Plaintiff Paul Berger*.

Thomas Curry, SAXENA WHITE P.A., Wilmington, DE; OF COUNSEL: David Schwartz, David Wales, Joshua Nelson, SAXENA WHITE P.A., White Plains, NY; Adam Warden, SAXENA WHITE P.A., Boca Raton, FL; *Attorneys for Plaintiff Kevin Barnes*.

Sabrina M. Hendershot and Miranda N. Gilbert, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, DE; OF COUNSEL: Geoffrey Chepiga, Nina Kovalenko, Marques Tracy, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, NY; *Attorneys for Defendants James Fox, Luis A. Aguilar, Gayle Crowell, Valerie Mosley, Gregory Smith, Lauren Taylor Wolfe, and Barbara Turner*.

Tammy L. Mercer, Amanda K. Pooler, Alberto E. Chávez, AKERMAN LLP, Wilmington, DE; OF COUNSEL: Andrew Clubok, Blair Connelly, Anthony R. Sarna, Amanda Di, LATHAM & WATKINS LLP, New York, NY; *Attorneys for Defendant Morgan Stanley & Co. LLC*.

**DAVID, V.C.**

The plaintiffs in this action attempt a feat of pleading by alleging, post-closing, that undisputedly independent directors breached their fiduciary duties by approving an arm's-length merger after a months-long sales process that generated a premium to the target company's unaffected share price. If that task sounds difficult, that is because it runs counter to the foundation of our corporation law—the business judgment rule—under which Delaware courts refuse to substitute their own judgment for the decisions of independent directors acting in good faith and with due care.

To challenge the arm's-length merger here, the plaintiffs attempt to allege that independent directors acted in bad faith by engaging a financial advisor they knew to be conflicted, then stood idly by while the advisor steered a deal to favor its preferred bidder. This theory falls apart for two independent reasons. First, the merger was approved by an overwhelming majority of fully informed, disinterested stockholders. The plaintiffs argue that the proxy issued in connection with the merger failed to disclose details about the board's financial and legal advisors' conflicts and the value of a competing bid, defeating *Corwin* cleansing. But the proxy disclosed all material information on those topics. The stockholder vote was fully informed, and *Corwin* extinguishes the plaintiffs' claims.

Second, even if *Corwin* did not apply, the complaint fails to state a claim for breach of fiduciary duty against undisputedly independent directors. An exculpation

provision insulates the directors from breaches of the duty of care, and the plaintiffs do not even attempt to allege that a majority of the directors who approved the merger were interested in, or lacked independence with respect to, that decision. The plaintiffs' remaining path is to plead bad faith, a difficult standard to meet. Here, the complaint fails to adequately allege that the directors intentionally caused the proxy to omit material information, a daunting task when independent directors have no motive for intentionally withholding disclosures. Nor does the complaint adequately allege that the independent directors breached a non-exculpated duty in connection with the sales process. The plaintiffs argue that the directors breached their "*Revlon* duties," but they are still limited to pleading bad faith. The plaintiffs' attempt to second-guess the board's decision-making fails to support an inference that independent directors acted in bad faith by intentionally failing to run a reasonable sales process.

The complaint also fails to state a claim for aiding and abetting. As alleged, the financial advisor fully disclosed its relationships with all bidders, including the buyer, to the board. The complaint does not allege that the financial advisor had an incentive to favor one bidder over another, let alone that it took any action without board direction or approval, or concealed information from or otherwise misled the board. As a result, the complaint fails to identify any breach of the duty of care in which the financial advisor "knowingly participated."

2

For these reasons, explained more fully below, the plaintiffs' complaint is dismissed in its entirety.

# I.    BACKGROUND[1]

## A.    Envestnet Explores A Potential Sale Of The Company But No Deal Materializes.

In November 2024, funds affiliated with Bain Capital Private Equity LP ("Bain") acquired all outstanding shares of Envestnet, Inc. ("Envestnet" or the "Company") in an all-cash take-private merger (the "Merger").  Compl. at 1–2, ¶¶ 158–59.

Prior to the Merger, Envestnet was a publicly traded Delaware corporation in the financial technology industry.  *Id.* ¶¶ 20–21.  Envestnet provided a wealth

---

[1] The following facts are taken from the Verified Class Action Complaint (the "Complaint") and the documents incorporated by reference therein.  Verified Class Action Compl. [hereinafter Compl.], Dkt. 1; *see Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013) ("A judge may consider documents outside of the pleadings only when[] . . . the document is integral to a plaintiff's claim and incorporated in the complaint . . . ." (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))); *see* 8 *Del. C.* § 220(b)(3).  Documents attached to the Transmittal Affidavit of Sabrina M. Hendershot in support of the Director Defendants' motion to dismiss are cited as "DX __" unless otherwise defined.  Transmittal Aff. of Sabrina M. Hendershot in Supp. of the Director Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Counts I and II of the Verified Class Action Compl., Dkt. 24.  Documents attached to the Transmittal Affidavit of Alberto E. Chávez in support of Morgan Stanley & Co. LLC's motion to dismiss are cited as "Chávez Aff., Ex. __".  Transmittal Aff. of Alberto E. Chávez in Supp. of Opening Br. in Supp. of Morgan Stanley & Co. LLC's Mot. to Dismiss the Aiding and Abetting Claim in Count III of the Verified Class Action Compl., Dkt. 22.  Citations to "Tr. __" refer to the transcript of the July 1, 2026 oral argument. Dkt. 53.

management platform using integrated technology, intelligent data, and wealth management software to financial advisors and service providers. *Id.* ¶ 21; DX 1 [hereinafter Proxy] at 33–34. Envestnet's board of directors (the "Board") comprised defendants James Fox, Luis A. Aguilar, Gayle Crowell, Valerie Mosley, Gregory Smith, Lauren Taylor Wolfe, and Barbara Turner (the "Director Defendants"). Compl. ¶¶ 12–18.

In late 2019, Envestnet's future became uncertain after the sudden death of its co-founder and Chief Executive Officer ("CEO"), Jud Bergman. *Id.* ¶ 28. The Board retained Goldman Sachs to conduct a strategic review process, during which the Board considered a sale of the Company or a divestiture of its Data & Analytics business (the "D&A Business"). *Id.* ¶¶ 23, 28. In May 2020, Bain submitted a non-binding proposal to acquire the Company for $57 to $62 per share in cash, contingent on a divestiture of the D&A Business. *Id.* ¶ 28. The Board was not willing to pursue a transaction contingent on a sale of the D&A Business at that time and the strategic review process did not result in a transaction. *Id.* ¶¶ 28, 36; Proxy at 36–37.

Envestnet undertook another strategic review two years later, this time led by Piper Sandler. Compl. ¶ 29. Envestnet entered discussions with several parties, including Bain. *Id.* ¶ 31; Proxy at 37. Envestnet and Bain executed a nondisclosure agreement (the "2022 Bain NDA") and explored a potential transaction until April 2022, but a deal never materialized. Compl. ¶¶ 31–32; Proxy at 37. In August

4

2022, the parties amended the 2022 Bain NDA to permit Bain to acquire additional shares of Envestnet. Compl. ¶ 33.

Five months later, in January 2023, an "unnamed financial advisory firm representing the Company" (not Morgan Stanley) contacted Bain to discuss an acquisition of the Company again. *Id.* ¶ 34; Proxy at 37. The 2022 Bain NDA was amended to extend Bain's standstill obligations until January 5, 2024, and Bain met with Envestnet and conducted preliminary due diligence. Compl. ¶ 35; Proxy at 37. On February 12, 2023, Bain notified the Company that it would not submit a bid because it could not offer a premium to Envestnet's trading price. Compl. ¶ 36; Proxy at 37.

**B.      Envestnet Begins A Sale Process For The D&A Business.**

Between February 13 and November 6, Envestnet's stock price declined from $65 per share to below $35 per share, due in part to "declining revenue and volatility in [the Company's] banking customer base." Compl. ¶ 38 (citation omitted).

At the end of 2023, the Board engaged yet another financial advisor in connection with a possible sale of the D&A Business. Proxy at 37. *Bloomberg* leaked that the Company had hired an advisor to solicit interest in the sale of the D&A Business, noting that "persistent deterioration in the [D&A] [B]usiness" presented a "real concern for Envestnet." DX 6 at 1–2.

In January 2024, the Company announced the departure of its interim CEO, effective March 31. Compl. ¶ 41. The Board appointed Fox as interim CEO beginning April 1. Proxy at 38; *see* Compl. ¶ 137.

The next week, Envestnet met with Bain again to discuss a potential transaction. Compl. ¶¶ 42–43; Proxy at 38.

In February 2024, Envestnet formally launched a sale process for the D&A Business, which "included outreach to an affiliate of Bain," among many other potential bidders. Compl. ¶ 44; Proxy at 38.

### C. Bain Submits A Proposal To Acquire Envestnet And The Company Hires Financial And Legal Advisors.

On March 23, Bain submitted a non-binding proposal to acquire the Company for $62 to $64 per share in cash ("Bain's March Proposal"). Compl. ¶ 45; Proxy at 38. Bain's March Proposal cited Bain's "in-depth recent evaluation" and "extensive due diligence," including its "participation in prior sales processes" and "review of recent publicly available information," as support for the proposal. DX 9 at 2. Bain's March Proposal explained that Bain would finance the transaction with "a combination of equity from Bain Capital-controlled funds and third-party coinvestors, and third-party debt financing," and expressed the "utmost confidence" that Bain could obtain the necessary financing in advance of a signing in five weeks. Compl. ¶ 45; Proxy at 38.

On March 27, the Board met to consider Bain's March Proposal. Compl. ¶ 46; Proxy at 38. According to the Proxy, at that meeting, the Board instructed Fox to contact Morgan Stanley & Co. LLC ("Morgan Stanley," and with the Director Defendants, "Defendants"), with whom the Company "had a pre-existing and unrelated engagement[,] to ask them to advise on [Bain's March] Proposal and the Board's review of other strategic alternatives." Proxy at 38; Compl. ¶¶ 19, 46.[2]

On April 2, Morgan Stanley sent the Board a relationship disclosure (the "April 2 Disclosure") describing its relationships with Envestnet and Bain. Compl. ¶ 48; Proxy at 38; DX 11. The April 2 Disclosure stated that in the two years prior to the disclosure, Morgan Stanley and its affiliates had earned financial advisory and financing fees of approximately $5 to $6 million from Envestnet and $35 to $40 million from Bain. Compl. ¶ 48; DX 11 at 1. The April 2 Disclosure further disclosed that Morgan Stanley was a lender to Envestnet, Bain, and Bain affiliates. Compl. ¶ 54; DX 11 at 1. In addition, the April 2 Disclosure disclosed to the Board that the prior month, Morgan Stanley had shared materials concerning an illustrative buyout analysis of the Company (the "Illustrative LBO Analysis") with Bain:

> In March 2024[,] Morgan Stanley prepared written discussion materials concerning the Company, which materials, among other things, showed an illustrative leveraged buyout analysis of the Company using an assumed purchase price of $60-80 per share for the Company's

---

[2] Plaintiffs note that the March 27 Board meeting minutes do not mention Morgan Stanley or "any discussion of alternative advisor candidates." Compl. ¶ 47; *see* DX 10 at 1.

7

common stock. The materials were prepared by Morgan Stanley in the ordinary course and were shared with two financial sponsors, one of which was Bain Capital. Morgan Stanley was and is not engaged by, or otherwise providing services to, either such financial sponsor (or any other party) in connection with the Transaction.

Compl. ¶ 51; DX 11 at 2.[3]

On April 3, Morgan Stanley provided an updated relationship disclosure (the "April 3 Disclosure"). Compl. ¶ 61; Proxy at 39. The April 3 Disclosure further disclosed that Morgan Stanley owned "between 10% and 15% in the common stock of a publicly traded Bain Capital LP related entity," and that it owned up to 2% of the common stock of other Bain-affiliated entities. Compl. ¶ 61.

Around the same time, the Board retained the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") as its legal counsel to advise on a potential transaction. Proxy at 39; *see* Compl. ¶ 56.[4]

The Board formally engaged Morgan Stanley to advise on Bain's March Proposal and other strategic alternatives on April 14. Compl. ¶ 65; Proxy at 39. Morgan Stanley's engagement letter entitled Morgan Stanley to a $3 million fee for

---

[3] Morgan Stanley supplemented the April 2 Disclosure at least four times, on April 3, May 20, June 18, and July 10. Compl. ¶¶ 61, 96, 108, 126; Proxy at 39, 43, 45, 49.

[4] The Company retained Paul, Weiss in April but did not execute an engagement letter until July 10, the day before the Merger was approved. *See* Compl. ¶ 57.

rendering a fairness opinion and an additional fee equal to 1.1% of the deal value upon consummation of a transaction. Compl. ¶ 66.

**D.    Envestnet Receives Unsolicited Acquisition Proposals From FNZ And GTCR.**

On April 16, *Reuters* published an article reporting that after receiving interest from private equity firms, including Bain, Envestnet was exploring strategic alternatives that could include a potential sale of the Company. *Id.* ¶ 70; Proxy at 39.

The next day, the Board met again to discuss Bain's March Proposal. Management presented preliminary draft long-range projections for the fiscal years 2024 through 2028, and Morgan Stanley presented preliminary analyses, including a discounted cash flow ("DCF") analysis, based on the draft projections. Compl. ¶ 73; Proxy at 39. Morgan Stanley's DCF analysis implied a value range of approximately $60.75 to $77.00 per share using a 3% growth rate (with a midpoint of $68.88 per share), $63.50 to $80.50 per share using a 4% growth rate (with a midpoint of $72.00 per share), and $66.50 to $84.00 per share using a 5% growth rate (with a midpoint of $75.25 per share). Compl. ¶ 73; DX 13 at 48–50. Morgan Stanley also identified fourteen potential strategic counterparties and ten potential financial sponsors. Proxy at 40; DX 13 at 1–2. The Board directed Morgan Stanley to encourage Bain to improve its March Proposal and to offer incremental diligence materials. Proxy at 40; Compl. ¶ 74. The Board also directed Company management to continue to develop the projections. Proxy at 40; Compl. ¶ 74.

9

On April 18, Envestnet and Bain entered into a new nondisclosure agreement (the "2024 Bain NDA"). Compl. ¶ 75.

On April 26, private equity firm GTCR LLC ("GTCR") submitted an unsolicited non-binding proposal to acquire the Company for $70 to $75 per share in cash ("GTCR's April Proposal"). *Id.* ¶ 76; Proxy at 40. GTCR's April Proposal stated that GTCR "expected it would need to raise third-party debt financing to finance the transaction consideration" and "was prepared to move expeditiously." Proxy at 40; Compl. ¶ 76. The next day, strategic party FNZ Group ("FNZ") submitted another unsolicited non-binding proposal to acquire the Company for $67 to $71 per share in cash ("FNZ's April Proposal"). Compl. ¶ 77; Proxy at 40. FNZ, which had a strategic partnership with the Company to distribute its wealth data platform internationally, stated that FNZ's April Proposal was "not subject to any financing contingencies" and it expected that a transaction could be signed within 30 to 45 days. Compl. ¶ 77; Proxy at 40–41.

The Board met on April 29 to discuss the proposals. Compl. ¶ 78. "The Board discussed the fact that the [two] proposals offered higher prices for the Company than [Bain's March] Proposal and also discussed that neither of the [two] proposals had yet identified or secured financing partners to complete a transaction." Proxy at 41; DX 16 [hereinafter April 29 Minutes] at 2. The Board considered "whether either [FNZ] or [GTCR] had the financial capability to potentially acquire the

10

Company without committed debt or equity financing," "the importance of fully committed financing at signing," and "that each [b]idder's ability to secure financing directly related to deal certainty." April 29 Minutes at 3. The Board also considered that a transaction with GTCR or FNZ posed a greater risk of regulatory delay than a transaction with Bain. *Id.* at 2–3.

The Board set a May 20 deadline for GTCR and FNZ to submit financing proposals. Compl. ¶ 79; April 29 Minutes at 4. In the days following, the Company entered into nondisclosure agreements with GTCR and FNZ and provided each bidder with access to Envestnet's virtual data room. Compl. ¶ 82.

On May 8, the Board held a meeting at which management presented revised projections "based on management's 2024 annual financial plan." *Id.* ¶ 87. The Board also received an update on the D&A Business sale process, in which, following outreach to more than 80 bidders, four bidders remained in discussions with the Company. DX 8 at 2–3. Preliminary proposals for the D&A Business ranged from $250 million to $325 million. *Id.*

### E.    GTCR, Bain, And FNZ Submit Revised Proposals.

On May 20, GTCR submitted a revised non-binding proposal to acquire the Company for $72.50 per share in cash ("GTCR's May Proposal"). Compl. ¶ 88. GTCR's May Proposal stated that GTCR had obtained equity commitments from GTCR-affiliated funds and third-party co-investors and secured debt financing

11

through signed debt commitment letters from Barclays Bank PLC, JPMorgan Chase Bank, N.A., and Wells Fargo Bank. *Id.* ¶ 91. GTCR's May Proposal further stated that GTCR "expect[ed] to complete diligence within three weeks." *Id.*; DX 17 at 25.

The same day, Bain submitted a revised non-binding proposal to acquire the Company for $67.50 per share in cash ("Bain's May Proposal"). Compl. ¶ 88. Bain's May Proposal reiterated that Bain would fund the purchase price with equity from Bain funds and third-party co-investors and third-party debt financing. DX 17 at 17; *see* Compl. ¶ 89. Bain again expressed the "utmost confidence in [its] ability to provide financing commitments" and sought permission to contact four banks, six direct lenders, eleven limited partners, and four strategic investors for additional financing. DX 17 at 17; Compl. ¶ 89. Bain's May Proposal indicated that Bain could sign a deal within two to three weeks. DX 17 at 16; Compl. ¶ 89.

Morgan Stanley also provided an updated relationship disclosure on May 20 (the "May 20 Disclosure"). Compl. ¶ 96; *see* Proxy at 43. The May 20 Disclosure stated that in the two years prior to the disclosure, Morgan Stanley and its affiliates had received $40 to $50 million in fees from Bain, an increase from the $35 to $40 million in fees identified in the April 2 Disclosure. Compl. ¶ 96. It also stated that in the two years prior to the disclosure, Morgan Stanley and its affiliates had received $40 to $50 million in fees from GTCR and its affiliates, and that a member of

12

Morgan Stanley's senior deal team was a member of FNZ's coverage team. Chávez Aff., Ex. K at 1–2.

The next day, May 21, FNZ submitted a revised non-binding proposal to acquire the Company for $71 per share in cash ("FNZ's May Proposal"). Compl. ¶ 88. FNZ's May Proposal enclosed a signed debt commitment letter for approximately $4.5 billion and preferred equity support letters for approximately $2.9 billion. *Id.* ¶ 90. FNZ's May Proposal stated that FNZ would use $2.1 billion of committed financing to refinance its own debt, its proposal would "not be conditional on obtaining financing," and expressed a desire to sign within four weeks. *Id.*

When the Board and its advisors met to review the revised proposals,[5] Morgan Stanley expressed its belief that GTCR's and FNZ's proposals offered more cash per share than Bain's because GTCR and FNZ "likely expected to achieve significant business-operation synergies" following the merger. Compl. ¶ 92. But Morgan Stanley also noted that "Bain was likely to be able to complete its diligence on an expeditious timeline." *Id.* The Board asked questions about the structure of FNZ's May Proposal, which sought to finance the entire transaction with debt and preferred equity, and Morgan Stanley said it would seek clarity on FNZ's financing

---

[5] Minutes before the Board's May 23 meeting, *Bloomberg* reported that Envestnet was drawing interest from potential buyers, including GTCR. DX 18.

13

structure. DX 17 at 3. The Board set a June 19 deadline to complete diligence, secure financing, and submit final bids. Compl. ¶ 93. The Board also agreed to permit the bidders to contact a limited number of *bona fide* financing sources. *Id.*

Days later, the Board met again to discuss the sales process. *Id.* ¶ 94. The Board discussed that "widespread news reports [of a potential transaction] may have reduced, perhaps significantly, the additional value of undertaking a pre-signing market check or go-shop as compared to situations without such press coverage." DX 14 at 2. The Board also considered "strong feedback" from FNZ and Bain rejecting a go-shop provision in their mark-ups of a draft merger agreement. *Id.* "Weighing those factors, the Board determined that provided that a relatively low (below 3%) termination fee could be agreed to be paid by the Company in the event that a bidder wanted to acquire the Company following the signing of a merger agreement, there would be sufficient opportunity for any bidders that had not decided to approach the Company following the news coverage to emerge." *Id.*

Paul, Weiss gave an updated regulatory analysis in which it advised that a transaction with Bain or FNZ "posed little to no antitrust risk and that such a transaction would very likely receive regulatory clearance," while a transaction with GTCR "had a greater likelihood of an extended investigation." DX 14 at 2–3.

## F. GTCR Withdraws From The Bidding Process.

On June 12, GTCR sent a letter to the Board stating that GTCR would not be in a position to submit a revised proposal by the June 19 deadline due to "limited access to Company data and management." Compl. ¶ 97. GTCR stated that "[s]hould these circumstances change materially," GTCR would be "pleased to discuss re-engaging to complete [its] diligence and submit a binding proposal to acquire the Company." DX 19 [hereinafter June 14 Minutes] at 7. But when Morgan Stanley contacted GTCR the next day to discuss its concerns, GTCR declined to re-engage and reiterated its intent to exit the process. Compl. ¶¶ 99–100.

When the Board met to discuss GTCR's June 12 letter,

> Representatives of Morgan Stanley, with input from representatives of Paul, Weiss, . . . reviewed in detail the amount of information and access to members of Company management that had been provided to [GTCR] in comparison to [Bain] and [FNZ], noting that [GTCR] had been provided substantially similar access to Company management as [Bain] and [FNZ] and that [GTCR] had been given appropriate access to the virtual data room for diligence purposes.

June 14 Minutes at 2; *see* Compl. ¶ 100. Morgan Stanley told the Board that GTCR "had cancelled several hours of meetings with Company management" prior to June 12, and GTCR "had not responded to offers from . . . Morgan Stanley to schedule . . . additional calls with members of Company management." June 14 Minutes at 2. The Board discussed possible reasons for GTCR's exit from the process, as well as the benefits and risks of further outreach to GTCR or an extension

of the June 19 deadline. Compl. ¶ 100; June 14 Minutes at 2. The Board decided to continue discussions with Bain and FNZ consistent with the June 19 deadline. June 14 Minutes at 2; *see* Compl. ¶ 100. The Board also directed Paul, Weiss to communicate with GTCR to better understand its concerns and to encourage GTCR to submit a final proposal by June 19. June 14 Minutes at 3.

On June 16 and 17, the Company informed GTCR, FNZ, and Bain that updated proposals to acquire the D&A Business reflected a value of between $100 million and $220 million, significantly less than preliminary proposals for between $250 million and $325 million. Proxy at 42, 45; Compl. ¶ 101.

### G. Bain Submits Another Proposal.

On June 18, FNZ informed the Company that it had not secured financing to submit a final proposal by June 19, and that, while "it may be able to submit a revised proposal," it "would require at least several additional weeks to secure the necessary financing." Proxy at 45; *see* Compl. ¶¶ 102–03.

On June 19, Bain submitted a proposal to acquire the Company for $62.75 per share in cash, plus a cash amount equal to any consideration received by the Company for the sale of the D&A Business if the divestiture was completed by closing ("Bain's June Proposal"). Compl. ¶ 105. Bain's June Proposal was not contingent on a sale of the D&A Business, and stated that the purchase price would be funded with $1.8 billion from Bain-advised funds, third-party co-investors, and

16

strategic partners, plus committed debt and preferred equity. Proxy at 45. Bain's June Proposal stated that Bain had completed diligence and obtained internal approvals, and was prepared to sign a deal within one week. *Id.* at 45–46.

Over the next two days, the Board met to consider Bain's June Proposal and the D&A Business sale process. DX 20–21; *see* Compl. ¶¶ 106, 111. The Board and its advisors concluded that Bain likely decreased its offer due to lower valuations received for the D&A Business. DX 21 at 2. The Board reviewed an updated relationship disclosure that Morgan Stanley delivered on June 18 (the "June 18 Disclosure"), which disclosed that Morgan Stanley had received $15 to $30 million in fees from GTCR in the two years prior to the disclosure, down from $40 to $50 million in the May 20 Disclosure. Compl. ¶ 108; Chávez Aff., Exs. K–L. The June 18 Disclosure also disclosed $30 to $50 million in fees from Bain, down from $40 to $50 million in the May 20 Disclosure. Compl. ¶ 108; Chávez Aff., Exs. K–L. Morgan Stanley presented the Board with a revised DCF analysis yielding a valuation range of $60.75 to $76.50 per share, with a midpoint of $68.63. Compl. ¶ 112. The Board agreed to reconvene after the weekend to allow time for an additional bid from FNZ, but also instructed Morgan Stanley to counter Bain's June Proposal at $64 per share, confirm that the deal would not be conditioned on a sale of the D&A Business, and ensure Bain would have committed financing at signing. DX 20 at 4.

**H. FNZ Submits Another Proposal, GTCR Confirms It Is Out, And The Board Counters Bain's June Proposal.**

On June 21, FNZ told Fox that it would submit a proposal to acquire the Company the following day. Compl. ¶ 114. The next day, FNZ submitted a revised proposal to acquire the Company for $70 per share in cash ("FNZ's June Proposal"). *Id.* ¶ 115. FNZ's June Proposal asked for three to four weeks to secure financing and an exclusivity period of up to four weeks. DX 22 at 7–8. FNZ's June Proposal proposed a rollover in which BlackRock, a substantial Envestnet stockholder, would exchange its Envestnet shares for FNZ shares and an additional equity commitment. Compl. ¶ 115. Although BlackRock agreed to "evaluate" a rollover, it had not committed to one. DX 22 at 6–7. FNZ's June Proposal was also contingent on the sale of the D&A Business and contemplated that proceeds from the sale would be distributed to Envestnet stockholders. Compl. ¶ 115. FNZ's June Proposal stated that FNZ valued its proposal at approximately $72 to $73 per share, assuming the divestiture of the D&A Business yielded proceeds of $100 million to $160 million. *Id.*

On Monday, June 24, the Board reconvened to discuss the sales process. *Id.* ¶ 116. Morgan Stanley reported that FNZ's financial advisor had asked for feedback on FNZ's June Proposal and Morgan Stanley relayed concerns about FNZ's financing. *Id.* FNZ's advisor told Morgan Stanley that FNZ was attempting to secure financing commitments but had not yet done so. DX 22 at 2. The Board

agreed that it would require fully committed financing at signing, and also considered that FNZ's June Proposal was contingent on the sale of the D&A Business, "introducing closing risks not present in the [Bain] proposal." *Id.*

In addition, Fox told the Board that he had spoken with a representative at GTCR, who told him GTCR would not be able to make another offer for the Company in the near term and that it had gotten "ahead of [its] skis" when it made its earlier proposals. *Id.* Morgan Stanley also reported that it tried to connect with GTCR on multiple occasions but had not heard back. *Id.*

In weighing the viability of a transaction with FNZ or GTCR, the Board considered that Bain "had been consistent, straightforward and timely in its proposals." *Id.* Morgan Stanley informed the Board that Bain's valuation of the Company had in fact been affected by the recent proposals for the D&A Business, and while Bain's June Proposal was not contingent on a sale of the D&A Business, Bain expected consent rights over the sale of the D&A Business prior to closing. Compl. ¶ 116.

The Board again considered whether it should extend the transaction timeline to accommodate FNZ's attempt to secure financing, but concluded that even if FNZ were to obtain financing, its offer was contingent on a sale of the D&A Business, which was uncertain. DX 22 at 3; *see* Compl. ¶ 117. The Board also discussed that

media reports surrounding the Company's process created uncertainty for employees, business partners, and customers. DX 22 at 3.

The Board then discussed the Company's standalone prospects and Morgan Stanley's "advice and financial analyses." *Id.* The Board concluded that "the amount and certainty of Bain's offer was likely to provide greater value to the Company's shareholders" than the Company's standalone plan when considering the execution risk associated with Envestnet's turnaround plans and the potential that the D&A Business may realize a lower-than-expected transaction value. *Id.* The Board again directed Morgan Stanley to attempt to negotiate a price increase from Bain. *Id.*; *see* Compl. ¶ 118.

## I. The Board Accepts Bain's "Best And Final" Proposal.

On June 25, Bain provided Morgan Stanley with a "best and final" offer to acquire the Company for $63.15 per share in cash, conditioned on exclusivity through July 10 (the "Final Bain Proposal"). Compl. ¶ 120; Proxy at 48.

The Board met to consider the Final Bain Proposal the same day. *Id.* ¶ 121. At the meeting, Morgan Stanley informed the Board that GTCR had reaffirmed that it would not submit another proposal. DX 15 at 2. Morgan Stanley and Paul, Weiss further informed the Board that FNZ would require additional weeks to arrange committed financing and could not provide a definite response regarding its expected financing sources. *Id.*

The Board considered whether to attempt to solicit revised bids from GTCR or FNZ but concluded that neither bidder had demonstrated the same level of interest in the Company as Bain. *Id.* The Board noted that it had already pushed Bain on price, waiting on a revised proposal from FNZ risked jeopardizing a transaction with Bain, and a transaction with FNZ was still conditioned on a sale of the D&A Business. *Id.*

After concluding that further efforts to extract price increases from Bain were unlikely to be successful, the Board determined to accept the Final Bain Proposal and grant Bain limited exclusivity through July 10. *Id.* at 2–3.

Beginning on June 26, Envestnet and Bain exchanged drafts of a merger agreement (the "Merger Agreement"). Compl. ¶ 122. On July 9, the Board held a meeting at which it received an update on negotiations and a presentation from Morgan Stanley on valuation. *Id.* ¶ 124. Morgan Stanley's presentation showed that Bain's $63.15 per share offer represented a 4.8% discount to the Company's 52-week share price high of $66.31, but an 11.7% premium to the unaffected share price of $56.54 and a 12.1% premium to the unaffected 30-day volume-weighted average share price of $56.35. *Id.*; DX 23 at 34.

On July 10, Morgan Stanley provided another relationship disclosure (the "July 10 Disclosure"), which disclosed:

> Morgan Stanley is mandated on a large number of advisory and financing assignments for certain Bain Related Entities . . . , in each

21

case unrelated to the Transaction, for which we would expect to receive customary fees if such transactions are completed. We expect that such fees from the Bain Related Entities would be significantly more, in the aggregate, than the fees Morgan Stanley would receive from the Company in the Transaction.

Compl. ¶ 126; Proxy at 49.

On July 11, the Board met again and discussed the July 10 Disclosure, concluding that the relationships disclosed therein "would not interfere with Morgan Stanley's ability to provide advisory services or render a fairness opinion to the Board." Compl. ¶ 128. Morgan Stanley subsequently provided an updated valuation presentation and fairness opinion to the Board. *Id.* ¶ 129. Following Morgan Stanley's presentation, the Board unanimously approved entry into the Merger Agreement. *Id.* ¶ 132. The Board also authorized a $900,000 discretionary cash bonus to Fox for his work on the transaction. *Id.*

Later that day, the Company publicly announced the Merger. *Id.* ¶ 133.

## J.     Envestnet Stockholders Approve The Transaction.

On August 23, 2024, Envestnet filed a definitive proxy statement (the "Proxy") with the Securities and Exchange Commission in connection with the Merger. *Id.* ¶ 151. With respect to Morgan Stanley's fee, the Proxy disclosed:

> Envestnet has agreed to pay Morgan Stanley for its services in connection with the Merger an aggregate fee, a significant portion of which is contingent upon the closing of the Merger, which is estimated, as of the date of this Proxy Statement, to be approximately $50 million (which we refer to as the "Morgan Stanley Transaction Fee"), $3 million of which was payable upon the rendering of a financial opinion

22

to the Board, which will be credited against the Morgan Stanley Transaction Fee payable if the Merger is consummated.

Proxy at 65. With respect to prior fees Morgan Stanley had earned from Envestnet and Bain, the Proxy disclosed:

> In the two years prior to the date of Morgan Stanley's opinion, Morgan Stanley and its affiliates provided financial advisory and financing services to Envestnet and received aggregate fees of approximately between $5 million and $6 million for such services. In the two years prior to the date of Morgan Stanley's opinion, Morgan Stanley and its affiliates . . . provided financial advisory and financing services for the Bain Related Entities and received aggregate fees of approximately between $30 million and $50 million for such services . . . .

*Id.* As for Morgan Stanley's current engagements with Bain, the Proxy stated:

> As of the date of Morgan Stanley's opinion, Morgan Stanley has been engaged for certain financial advisory services for Bain Related Entities . . . , in each case unrelated to the Merger, for which Morgan Stanley expects to receive customary fees if such transactions are completed. Morgan Stanley expects that such fees from the Bain Related Entities would be significantly more, in the aggregate, than the fees Morgan Stanley would receive from Envestnet in the Merger.

*Id.* at 66.

On September 24, 75.3% of all Envestnet shares outstanding and entitled to vote, excluding shares held by the Company's directors and officers, voted to approve the Merger. Compl. ¶ 158; The Director Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Counts I and II of the Verified Class Action Compl. [hereinafter OB] at 27, Dkt. 23. The Merger closed on November 25. Compl. ¶ 159.

23

Nearly a year after the Board approved the Merger with Bain, on June 25, 2025, the post-Merger Company announced an agreement to sell the D&A Business to private equity firm STG for an undisclosed sum.  DX 26 at 1.

### K.    Procedural History

In August 2024, Envestnet stockholders Paul Berger, as trustee for the Paul Berger Revocable Trust, and Kevin Barnes (together, "Plaintiffs") served demands under 8 *Del. C.* § 220 to inspect the Company's books and records concerning the Merger.  Compl. at 2 & n.1.  Envestnet produced documents to Plaintiffs in response to those demands.  *Id.* at 2.

On October 17, 2025, Plaintiffs initiated this action through the filing of the Complaint.[6]  Compl., Dkt. 1.  The Complaint advances three counts.  Count I alleges that the Director Defendants breached their fiduciary duties in connection with the Merger.  *Id.* ¶¶ 173–77.  Count II alleges that Fox, in his capacity as an officer of the Company, breached his fiduciary duties in connection with the Merger.  *Id.* ¶¶ 178–82.  Count III alleges that Morgan Stanley aided and abetted the Director Defendants' breaches of fiduciary duty.  *Id.* ¶¶ 183–87.

Defendants moved to dismiss the Complaint (the "Motions to Dismiss") on November 12 and 13, and filed opening briefs in support of the Motions to Dismiss

---

[6] The parties have agreed that the documents produced in response to the Section 220 demands are incorporated by reference in the Complaint.  DX 2 ¶ 20; DX 3 ¶ 20.

on January 16, 2026.[7] Plaintiffs filed an answering brief in opposition to the Motions to Dismiss on March 17 and an amended answering brief on April 10, and Defendants filed reply briefs in further support of the Motions on May 1.[8] The Court heard oral argument on July 1.

## II. ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim. When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

Defendants offer two bases for dismissal. First, they argue that *Corwin v. KKR Financial Holdings LLC*, 125 A.3d 304 (Del. 2015), compels dismissal

---

[7] OB, Dkt. 23; Opening Br. in Supp. of Def. Morgan Stanley & Co. LLC's Mot. to Dismiss the Aiding and Abetting Claim in Count III of the Verified Class Action Compl., Dkt. 22.

[8] Pls.' Am. Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss the Verified Class Action Compl. [hereinafter AB], Dkt. 31; The Director Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss Counts I and II of the Verified Class Action Compl., Dkt. 36; Reply Br. in Supp. of Def. Morgan Stanley & Co. LLC's Mot. to Dismiss the Aiding and Abetting Claim in Count III of the Verified Class Action Compl., Dkt. 38.

because the Merger was approved by a fully informed, uncoerced vote of disinterested stockholders. Second, they argue that even if *Corwin* does not require dismissal, the Complaint fails to state a claim for breach of fiduciary duty or aiding and abetting.

## A. Dismissal Is Warranted Under *Corwin*.

The Director Defendants first argue that dismissal is warranted under the *Corwin* doctrine. OB at 29–45. In *Corwin*, the Delaware Supreme Court confirmed that the business judgment rule applies when a transaction that does not involve a controller "is approved by a fully informed, uncoerced vote of the disinterested stockholders." 125 A.3d at 309. Delaware courts will not "second-guess the judgment of a disinterested stockholder majority that determines that a transaction with a party other than a controlling stockholder is in their best interests." *Id.* at 306.

### 1. The Stockholder Vote Was Fully Informed.

The stockholder vote on the Merger was fully informed if the Company's disclosures "apprised stockholders of all material information and did not materially mislead them." *Morrison v. Berry* (*Morrison I*), 191 A.3d 268, 282 (Del. 2018). "An omitted fact is material if there is a substantial likelihood that a reasonable [stockholder] would consider it important in deciding how to vote." *Id.* (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)). There must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed

26

by the reasonable [stockholder] as having significantly altered the 'total mix' of information made available." *Id.* at 283 (quoting *Getty Oil*, 493 A.2d at 944). "Assessing materiality is a difficult practice that requires balancing the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information." *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 749 (Del. Ch. 2016). "Delaware law requires stockholders to be fully informed, not 'infinitely informed.'" *Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *10 (Del. Ch. Jan. 31, 2023) (quoting *In re Merge Healthcare Inc.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017)).

At the pleading stage, the Court must determine whether the complaint "supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Morrison I*, 191 A.3d at 282. The plaintiff bears the burden of identifying a "deficiency in the operative disclosure document." *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017). Only then does the burden shift to the defendant to "establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote." *Id.*

Plaintiffs identify three alleged disclosure deficiencies that, in their view, make it "at least reasonably conceivable that the Merger vote was uninformed," foreclosing *Corwin* cleansing. AB at 27. Those alleged deficiencies concern

27

(1) Morgan Stanley's relationship and conduct with Bain; (2) Paul, Weiss's engagements with Bain; and (3) the value of FNZ's June Proposal.

### a. Morgan Stanley's Relationship With Bain

Plaintiffs maintain that the Proxy should have disclosed (1) additional information about Morgan Stanley's "concurrent representations" with Bain and (2) that Morgan Stanley shared the Illustrative LBO Analysis with Bain in March 2024. *Id.* at 28–41.

First, Plaintiffs argue that the Proxy should have disclosed additional details about Morgan Stanley's concurrent engagements with Bain. "When a financial advisor faces a conflict, this Court has generally required disclosure of the relationship itself and the amount of fees the advisor received." *Kihm v. Mott*, 2021 WL 3883875, at *18 (Del. Ch. Aug. 31, 2021), *aff'd*, 276 A.3d 462 (Del. 2022) (TABLE). The Proxy disclosed the fees Morgan Stanley stood to receive in connection with the Merger; the fees Morgan Stanley earned from Envestnet in the two years prior to the Merger; and the fees Morgan Stanley received from Bain in the two years prior to the Merger. Proxy at 65. The Proxy further disclosed that Morgan Stanley was presently engaged to provide financial advisory services for Bain and its affiliates unrelated to the Merger and expected to receive fees in the future if transactions were completed:

28

> As of the date of Morgan Stanley's opinion, Morgan Stanley has been engaged for certain financial advisory services for Bain Related Entities . . . , in each case unrelated to the Merger, for which Morgan Stanley expects to receive customary fees if such transactions are completed. ***Morgan Stanley expects that such fees from the Bain Related Entities would be significantly more***, in the aggregate, ***than the fees Morgan Stanley would receive from Envestnet in the Merger***.

*Id.* at 66 (emphasis added). Plaintiffs claim "the failure to disclose the amount of Morgan Stanley's expected fees from Bain-related entities 'prevented stockholders from contextualizing and evaluating [Morgan Stanley's] concurrent conflicts of interest'" with Bain against "Morgan Stanley's $50 million fee from the Merger." AB at 37 (citation omitted).[9] But the Proxy *did* provide context by explaining that the amount of fees Morgan Stanley expected to receive from Bain would be "significantly more" than the fees it would receive from Envestnet in the Merger. Proxy at 66. Plaintiffs say this description is "vague," but greater precision is not required. AB at 37. "[T]he disclosure of the specific fees a financial advisor received from unrelated work for a transactional counterparty is immaterial where the relationship and its *rough scale* are disclosed." *Assad v. Botha*, 2023 WL 7121419, at *6 (Del. Ch. Oct. 30, 2023) (emphasis added); *see also English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) (finding an omission

---

[9] Plaintiffs acknowledge that the Proxy did not need to disclose "the specific services Morgan Stanley provided to Bain" or "the precise identities of the 'specific counterparties'" involved in the engagements. *Id.* at 39–41.

was immaterial where the proxy disclosed that a financial advisor's fees from a transaction counterparty were "in an aggregate amount significantly less" than the fee earned for the fairness opinion), *aff'd*, 222 A.3d 581 (Del. 2019) (TABLE). That is particularly true where, as here, the disclosure of future fees for unrelated concurrent engagements would require guesswork, and imprecise disclosure itself could be misleading to stockholders.

Additionally, Plaintiffs contend that the above disclosure "exclude[d] ongoing matters between Morgan Stanley and Bain during the sales process that concluded prior to July 11," the date of Morgan Stanley's fairness opinion. AB at 38. Plaintiffs claim that, as a result, stockholders cannot tell whether "Morgan Stanley concurrently represented Bain on separate engagements during the entirety of the sale process." *Id.* at 39. The Proxy disclosed the fees Morgan Stanley received from Bain in the two years prior to its fairness opinion, and that the fees Morgan Stanley expected to receive from current engagements would be "significantly more" than the fee it would earn in connection with the Merger. Plaintiffs cite no authority requiring an additional breakdown of the specific fees earned between commencement of the deal process and delivery of a fairness opinion. Such a granular disclosure would not alter the total mix of information available to stockholders deciding whether to approve the Merger. *See, e.g.*, *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *11 (Del. Ch. Mar. 31, 2017) *as revised*

(Apr. 11, 2017) (finding disclosure was sufficient where the proxy identified "the prior working relationship and the amount of fees" received from the buyer "in the two previous years").

Second, Plaintiffs contend that the Proxy should have disclosed that Morgan Stanley shared the Illustrative LBO Analysis with Bain in March 2024, the same month Bain's March Proposal was provided to the Board. Morgan Stanley disclosed the Illustrative LBO Analysis to the Board in its April 2 Disclosure, before the Board formally retained Morgan Stanley as its financial advisor, explaining:

> In March 2024[,] Morgan Stanley prepared written discussion materials concerning the Company, which materials, among other things, showed an illustrative leveraged buyout analysis of the Company using an assumed purchase price of $60-80 per share for the Company's common stock. The materials were prepared by Morgan Stanley in the ordinary course and were shared with two financial sponsors, one of which was Bain Capital.

DX 11 at 2. Failing to mention the Illustrative LBO Analysis in the Proxy did not render the stockholder vote uninformed. Plaintiffs' theory of materiality relies on unreasonable inferences that the Illustrative LBO Analysis may have given Bain informational and timing advantages.[10]  However, Morgan Stanley shared the

---

[10] *See* AB at 30–31 ("By revealing the assumptions under which a financial sponsor could achieve its target returns, the analysis allowed Bain to calibrate its bid more precisely and quickly than competing firms that lacked this analysis."); *id.* at 35–36 ("The failure to disclose the [Illustrative LBO Analysis] concealed from stockholders that Bain received a

Illustrative LBO Analysis with Bain before it was retained to serve as Envestnet's financial advisor. The Complaint fails to allege facts supporting a reasonable inference that Morgan Stanley possessed recent confidential information that Bain did not already have through years of diligence under multiple NDAs. *See* Compl. ¶¶ 51–53.

Because Bain's March Proposal referenced undergoing an "in-depth evaluation" of the Company, Plaintiffs allege the Illustrative LBO Analysis conceivably "tip[ped]" Bain to "non-public Company information." *Id.* ¶¶ 52–53; AB at 68. The contents of Bain's March Proposal do not support that inference. Rather, Bain's March Proposal stated that it was based on "extensive due diligence on Envestnet, both from [Bain's] participation in prior sale processes as well as from [Bain's] review of recent publicly available information regarding the business." DX 9 at 2.

The Proxy fully informed stockholders of Bain's diligence on Envestnet during prior sales processes in 2020 through 2024. Proxy at 37–38, 40. At the very most, disclosing the Illustrative LBO Analysis could have "change[d] the degree" of

---

clear head start and informational advantage from the Board's own financial advisor."). Plaintiffs' "informational advantage" argument is not particularly compelling because although Plaintiffs argue that the Illustrative LBO Analysis "allowed Bain to calibrate its bid more precisely," the range of $60 to $80 per share in the analysis was so broad that it encompassed every bid received from all three bidders, not just Bain.

Bain's informational "head start," but stockholders were well aware that one existed. *Volcano*, 143 A.3d at 749. Even that is a stretch, and additional disclosure would not have significantly altered the total mix of information available to stockholders voting on the Merger.

### b. Paul, Weiss's Engagements With Bain

Plaintiffs next argue that the Proxy failed to disclose that Paul, Weiss "concurrently represented Bain on at least two separate transactions." AB at 41. As alleged, at the same time Paul, Weiss advised on the Merger, lawyers in its London office advised Bain portfolio companies on three European transactions unrelated to the Merger. Compl. ¶ 58; Tr. at 14:3–10.

Plaintiffs base this argument on the Delaware Supreme Court's decision in *City of Dearborn Police and Fire Revised Retirement System v. Brookfield Asset Management Inc.*, 314 A.3d 1108 (Del. 2024). In *Brookfield*, the Delaware Supreme Court reversed this Court's dismissal of a complaint challenging a squeeze-out merger, finding judicial cleansing under *MFW* was unavailable where material facts were not disclosed in a proxy. *Id.* at 1113. Among the material facts omitted, the proxy failed to disclose that the law firm representing the special committee that approved the transaction had simultaneously represented the controller in unrelated transactions. *Id.* at 1117. The Supreme Court agreed the issue was a "close call," but ultimately concluded that under those facts, the law firm's concurrent

33

representations were "material facts for stockholders that required disclosure." *Id.* at 1113, 1134.

I do not understand *Brookfield* to suggest that even in an arm's-length deal negotiated by an undisputedly independent board, the failure to specifically disclose all (even immaterial) concurrent engagements of the lawyers will automatically defeat *Corwin* cleansing. "Although advisor conflicts should be disclosed, a plaintiff must provide sufficient facts to establish that the conflict or potential conflict was material." *Harcum v. Lovoi*, 2022 WL 29695, at *21 (Del. Ch. Jan. 3, 2022) (footnote omitted).

Here, Plaintiffs have not even attempted to allege facts supporting an inference that the identified engagements were material to Paul, Weiss, raising a potential "concern that [the firm] might not want to push [Bain] too hard given the nature of their ongoing lawyer-client relationship which includes the ethical duty of zealous advocacy." *Brookfield*, 314 A.3d at 1134–35. The failure to disclose Paul, Weiss's unrelated European representations did not render the stockholder vote uninformed.

### c. Hypothetical Value Of FNZ's June Proposal

Plaintiffs allege that the Proxy failed to disclose that FNZ's June Proposal "represented approximately $72 per share assuming proceeds of $100 million from the sale of the D&A Business . . . and . . . approximately $73 per share assuming

$160 million from the sale of the D&A Business." AB at 45–46 (emphasis omitted). Plaintiffs argue that the Proxy should have disclosed that by July 9, 2024, Morgan Stanley "illustrat[ed] approximately $112 million in D&A Business net proceeds" in its analysis based on negotiations with a "potential finalist" in the D&A Business sale process, and that the potential finalist's $112 million offer would have made FNZ's June Proposal worth more than $72 per share. *Id.* at 46; *see* Compl. ¶¶ 125, 129.

The Proxy accurately disclosed that FNZ "submitted a revised non-binding proposal . . . to acquire the Company for $70.00 per share, in cash . . . , assuming no additional consideration was paid in respect of the sale of the D&A Business." Proxy at 47. That disclosure made clear that FNZ's $70 per share proposal did not include any additional consideration stockholders might receive in connection with a sale of the D&A Business, which at the time was uncertain. The Proxy also disclosed the range of bids the Company received for the D&A Business on May 8 and June 12, and that, at the direction of the Board, Morgan Stanley's DCF analysis accounted for potential proceeds from a sale of the D&A Business. *Id.* at 42, 44, 46, 62. Those disclosures were adequate to understand FNZ's June Proposal, possible proceeds of a sale of the D&A Business, and the basis for Morgan Stanley's analysis. The hypothetical valuation Plaintiffs say should have been disclosed was "inherently speculative and thus not required to be disclosed under Delaware law." *IRA Tr. FBO*

35

*Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *17 (Del. Ch. Dec. 11, 2017) *as revised* (Jan. 26, 2018).

## 2. The Business Judgment Rule Applies.

Plaintiffs do not assert that the Merger involved a conflicted controlling stockholder. They do not argue that the Envestnet stockholder vote was coerced. And they have not claimed that the Merger constituted corporate waste.[11] The Merger was approved by a majority of Envestnet's disinterested stockholders. As explained above, that vote was fully informed. The business judgment rule applies, and Plaintiffs' claims must be dismissed.[12]

## B. The Complaint Fails To State A Claim For Breach Of Fiduciary Duty Or Aiding And Abetting.

Defendants separately argue that even if *Corwin* does not compel dismissal, the Complaint fails to state a claim for breach of fiduciary duty against the Director Defendants or aiding and abetting breach of fiduciary duty against Morgan Stanley.

---

[11] *See In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 1001 (Del. Ch. 2014) (explaining that the "legal effect of a fully-informed stockholder vote of a transaction with a non-controlling stockholder is that the business judgment rule applies and insulates the transaction from all attacks other than on the grounds of waste"), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[12] A dismissal under *Corwin* disposes of the entire Complaint, including the aiding and abetting claim asserted against Morgan Stanley. *See Singh v. Attenborough*, 137 A.3d 151, 153 (Del. 2016) (ORDER) ("Having correctly decided . . . that the stockholder vote was fully informed and voluntary, the Court of Chancery properly dismissed the plaintiffs' claims against all parties.").

For the sake of completeness, I address this alternative argument and conclude that it, too, requires dismissal.

### 1. The Complaint Fails To Plead A Non-Exculpated Claim Against The Director Defendants.

Envestnet's certificate of incorporation contains an exculpatory provision under 8 *Del. C.* § 102(b)(7) that insulates the Director Defendants from liability for breaches of the duty of care. DX 27 Art. VI ¶ 1.[13] Consequently, to state a claim for breach of fiduciary duty, Plaintiffs must plead a non-exculpated claim—that is, one that implicates the Director Defendants' duty of loyalty. *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1175 (Del. 2015).[14]

"In the context of a sales process, a plaintiff can plead that a board breached its duty of loyalty by alleging non-conclusory facts, which suggest that a majority of the board either was interested in the sales process or acted in bad faith in conducting

---

[13] Effective May 9, 2024, Envestnet amended its certificate of incorporation to exculpate both directors *and* officers for breaches of the duty of care. DX 28. As a result, even assuming Fox acted in his capacity as an officer and not a director, Plaintiffs cannot bring a claim for breach of the duty of care against him outside of an approximately five-week period, from April 1, 2024, when Fox assumed the interim CEO position, to May 9, 2024, when the amended certificate of incorporation took effect. The Complaint does not plead facts supporting an inference that Fox took any actions during that time period, let alone actions that amount to a breach of the duty of care.

[14] *See id.* ("A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision . . . , regardless of the underlying standard of review for the board's conduct—be it *Revlon*, *Unocal*, the entire fairness standard, or the business judgment rule." (footnotes omitted)).

37

the sales process." *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012). Plaintiffs do not allege that a majority of the Board was interested in or lacked independence with respect to the Merger,[15] leaving only the possibility for a bad faith claim. *See In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *26 (Del. Ch. Aug. 31, 2020) ("Other than pleading lack of independence or interestedness, the [p]laintiffs can survive the [d]efendants' Motion to Dismiss [only] by pleading facts supporting a rational inference that the [d]efendants acted in bad faith."), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021) (TABLE).

"A demonstration of bad faith requires acts or omissions taken against the interest of the Company, with scienter." *Morrison v. Berry* (*Morrison II*), 2019 WL 7369431, at *14 (Del. Ch. Dec. 31, 2019). "A director acts in bad faith where he or she 'intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his [or her] duties.'" *van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) (alteration in original) (quoting

---

[15] Plaintiffs allege that only one director—Fox—had a financial interest in the Merger. As interim CEO, Fox received a $350,000 per month salary through the close of the Merger. Compl. ¶¶ 137–38. The Board also approved paying Fox a one-time discretionary bonus of $900,000 when it approved the Merger. *Id.* ¶ 132. As Defendants argue, it is not reasonable to infer that Fox was incentivized to push through a bad deal in the hope of a discretionary bonus when extending the sales process while he continued to receive a salary would have resulted in an even greater financial benefit to him. Tr. at 85:21–86:14.

*Answers*, 2012 WL 1253072, at \*7).  Alternatively, "[b]ad faith will be found when 'the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground *other* than bad faith.'"  *Kahn v. Stern*, 2017 WL 3701611, at \*10 (Del. Ch. Aug. 28, 2017) (emphasis added) (quoting *In re Cyan, Inc. S'holders Litig.*, 2017 WL 1956955, at \*8 (Del. Ch. May 11, 2017)), *aff'd*, 188 A.3d 715 (Del. 2018) (TABLE).

"Bad faith is not a light pleading standard." *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at \*23 (Del. Ch. Oct. 24, 2014); *see also In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) ("This is a difficult standard to meet.").  "When challenging a transaction, it takes an 'extreme set of facts . . . to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties.'"  *Crimson*, 2014 WL 5449419, at \*23 (alteration in original) (quoting *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009)).  "Even gross negligence, without more, does not constitute bad faith." *Id.*  "Allegations that directors failed to do all they should have state merely a violation of the duty of care." *Id.*

Plaintiffs offer two theories of bad faith here.  First, they argue that the Director Defendants acted in bad faith by approving false and misleading disclosures in the Proxy.  Second, they argue that the Director Defendants acted in bad faith in

connection with the sales process. Both theories fall short of stating a claim for breach of the duty of loyalty to act in good faith.

### a.     Omissions In The Proxy

To plead a breach of the duty of loyalty to act in good faith based on disclosures, Plaintiffs must allege facts supporting an inference that the Director Defendants intentionally caused the Proxy to contain false information or intentionally disregarded their obligation to ensure that the Proxy disclosed all material information. *See USG*, 2020 WL 5126671, at \*26 ("An adequate pleading of bad faith must plead that the maldisclosure was 'intentional and constitute[d] more than an error of judgment or gross negligence.'" (quoting *Morrison II*, 2019 WL 7369431, at \*18)); *see also In re AmTrust Fin. Servs., Inc. S'holder Litig.*, 2020 WL 914563, at \*13 (Del. Ch. Feb. 26, 2020) (finding a complaint failed to plead bad faith without allegations that the directors "intended to disregard [their] obligation to ensure that the Company disclosed all material information to its stockholders"). "[E]ven if allegations of omissions or misleading disclosures are sufficient to preclude business judgment review under *Corwin*, where the same omissions or misleading disclosures are pled as evincing bad faith, the pleading is subject to a finer-toothed comb—that of scienter—which is among our law's most straightened." *USG*, 2020 WL 5126671, at \*26.

Plaintiffs contend that the Director Defendants acted in bad faith by failing to ensure that the Proxy disclosed Morgan Stanley's relationship with Bain; Paul, Weiss's engagements with Bain; and the hypothetical value implied by FNZ's June Proposal. Plaintiffs argue only that the Director Defendants had knowledge of the facts that were allegedly omitted, but not that they believed those facts were material or were aware they were omitted from a dense, 126-page Proxy. *See* AB at 52–53.[16]

As set out above, I am not convinced that the Proxy did, in fact, omit any material information. *See supra* pp. 26–36. But even if I am wrong about that, the purported omissions are not so egregious as to support an inference that the Director Defendants acted in bad faith by intentionally withholding information or abdicating their responsibility to ensure an accurate Proxy. Without identifying any motive for independent directors to intentionally withhold disclosures, and having failed to demonstrate a glaring omission, it is difficult to see how the allegations in the Complaint could support an inference that any purported omissions were intentional, rather than an error of judgment or negligence. *See Ligos v. Tsuff*, 2022 WL 17347542, at *11 (Del. Ch. Nov. 30, 2022) (explaining that where a "[p]laintiff can

---

[16] *See also id.* at 59 ("Because the Board had knowledge of, received, and would have reviewed Morgan Stanley's conflict disclosure memoranda and Paul[,] Weiss's engagement letter, as well as FNZ's June 22 topping offer, it is 'reasonably conceivable that all of the Director Defendants knew that the disclosures . . . were false and misleading because they participated in those events.'" (citation omitted)).

point to no motive for an intentional omission in the proxy," "bad faith must be demonstrated (if at all) by the extreme nature of the proxy omission itself"); *see also USG*, 2020 WL 5126671, at *28 (dismissing claims where it was "not reasonably conceivable that such non-disclosure rises to the level of conscious disregard of duty"); *Morrison II*, 2019 WL 7369431, at *20 (dismissing claims where it was "not . . . reasonable to infer that the omissions . . . demonstrate[d] an intentional derogation of duty or an intent to create a misleading document"); *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *13 (Del. Ch. Dec. 30, 2019) (dismissing bad faith disclosure claims where inferences drawn were "a far cry from implying bad faith"); *Nguyen v. Barrett*, 2016 WL 5404095, at *5 (Del. Ch. Sep. 28, 2016) ("The [p]laintiff has failed to plead facts such that it is reasonably conceivable that the allegedly incomplete disclosure was made by the board disloyally or in bad faith, as is required to sustain this claim post-close.").

This theory of bad faith therefore fails to support a non-exculpated claim for breach of fiduciary duty.

### b. *Revlon* Claims

Plaintiffs also argue that the Director Defendants breached a non-exculpated duty in connection with the sales process. Although Plaintiffs describe this as a breach of the Director Defendants' "*Revlon* duties," they are still limited to pleading bad faith. As Vice Chancellor Glasscock explained in *USG*, discussing "*Revlon*

duties" post-closing "is something of a misnomer" because "the fiduciary duties are loyalty and care, in any situation." 2020 WL 5126671, at *28.[17] "[T]o comply with *Revlon*, 'when a board engages in a change of control transaction, it must not take actions inconsistent with achieving the highest immediate value reasonably attainable.'" *Id.* (quoting *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1067 (Del. 2014)). "[A]lthough '*Revlon* can provide a contextual inquiry about whether the . . . [d]efendants' choices were reasonable under the circumstances as a good faith attempt to secure the highest value reasonably attainable,'" after closing, "Plaintiffs still bear the burden to plead a non-exculpated claim." *Id.* at *29 (quoting *Morrison II*, 2019 WL 7369431, at *15). As a result, "[a]n allegation implying that [] Defendant[s] failed to satisfy *Revlon* is insufficient on its own to plead a non-exculpated breach of the duty of loyalty, and a sufficient pleading must reasonably imply that the directors' failure to act reasonably to maximize price was tainted by interestedness or bad faith." *Id.* (footnotes and citations omitted).

"In the context of a sale of corporate control, bad faith is qualitatively different from 'an inadequate or flawed effort' to obtain the highest value reasonably available

---

[17] *Id.* ("*Revlon* 'duties' should not be confused with the *Revlon* standard of review, applicable principally outside the damages context, under which directors must act reasonably.").

43

for a corporation." *Essendant*, 2019 WL 7290944, at *13 (quoting *Lyondell*, 970 A.2d at 243). "Absent direct evidence of an improper intent, a plaintiff must point to 'a decision [that] lacked any rationally conceivable basis' associated with maximizing stockholder value to survive a motion to dismiss." *Id.* (quoting *Chen v. Howard-Anderson*, 87 A.3d 648, 684 (Del. Ch. 2014)). In other words, "for [] Plaintiffs to adequately plead a non-exculpated breach of duty, they must not only allege that the Board's sales process was unreasonable, they must also allege that the Board's alleged failure to run a *Revlon*-compliant sales process was an '*intentional* failure or a *conscious* disregard of the duty to seek the highest price reasonably available.'" *USG*, 2020 WL 5126671, at *29 (emphasis in original) (quoting *Essendant*, 2019 WL 7290944, at *14).

The allegations of the Complaint here fail to support a reasonable inference that the Director Defendants acted in bad faith by intentionally failing to run a reasonable sales process. Plaintiffs primarily contend that the Director Defendants failed to "maintain continuous and diligent oversight" of their purportedly conflicted advisors. AB at 63 (citation omitted). According to Plaintiffs, "Morgan Stanley disclosed a host of serious conflicts that should have precluded its engagement," and "[a]ny reasonable board would have taken steps to investigate and address those glaring red flags." *Id.* at 63–64. Plaintiffs claim that "the record reflects no analysis, discussion, investigation, or questioning as to whether Morgan Stanley could act

independently of Bain despite its shared history, concurrent representations, and role in engineering Bain's most recent bid." *Id.* at 64. Plaintiffs further suggest that the Board put Morgan Stanley "into the driver's seat of the Company's sale process," "turn[ing] a blind eye" to its supposed conflicts. *Id.* at 64–65.

The Board's selection of Morgan Stanley and Paul, Weiss as its advisors does not support an inference of bad faith. Both are leading public M&A advisors. Morgan Stanley provided the Board with at least five conflicts disclosures. *See supra* note 3. It is not without the bounds of reason to expect that independent directors considered those disclosures and determined that Morgan Stanley's experience outweighed the risk of a potential conflict, particularly after the Company had retained at least three other financial advisors in processes that did not culminate in a transaction. *See supra* pp. 4–5. Further, the Complaint does not even adequately allege that Paul, Weiss faced a material conflict, let alone that the Board acted in bad faith by retaining the firm as its legal advisor. *See supra* pp. 33–34.

Even Plaintiffs' cited authority acknowledges that a board is "free to consent to certain conflicts" so long as it remains "active and reasonably informed when overseeing the sale process." *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 855 (Del. 2015). Despite Plaintiffs' arguments to the contrary, the Complaint fails to allege any facts supporting a reasonable inference that the Board failed to oversee its advisors. Plaintiffs' position largely rests on conclusory rhetoric—that the Board

supposedly "placed Morgan Stanley into the driver's seat of the Company's sale process," allowed Morgan Stanley's conflicts to "infect[] the process," and stood by while Morgan Stanley "orchestrate[d] the sale process to benefit" Bain. AB at 64–65, 68. The only *facts* pled to support those conclusions are that Morgan Stanley (1) advised the Board (in Plaintiffs' words, "manufactured criticism") about GTCR's and FNZ's financing sources, (2) imposed a timeline on bids (per Plaintiffs, to benefit Bain's informational "head start"), and (3) limited GTCR's access to diligence and management. *Id.* at 68–69, 72–73. Plaintiffs fail to plead any facts suggesting the fully independent Board deferred to Morgan Stanley rather than reaching its own decisions. Nor does the Complaint support an inference that the Director Defendants acted in bad faith by weighing each bidder's ability to obtain financing or by setting deadlines that, as alleged, the Board extended to permit additional bids. *See supra* pp. 10–11, 13–14, 18–19.

Plaintiffs seize on GTCR's June 12, 2024 letter complaining of "limited access to diligence and Company management." *See supra* pp. 15–16. Plaintiffs argue that "[a]ny reasonable board seeking to maximize value would have done so by . . . providing better access to management in the face of credible topping bids." AB at 70. But the Complaint and documents incorporated by reference therein show that the Board met to discuss GTCR's June 12 letter, "reviewed in detail the amount of information and access to members of Company management that had been

46

provided to [GTCR] compared to [Bain] and [FNZ]," and directed Paul, Weiss (not Morgan Stanley) to communicate with GTCR to better understand its concerns and to encourage GTCR to submit a final proposal. *See supra* pp. 15–16. Fox also later told the Board that GTCR conveyed to him that it had gotten "ahead of [its] skis" when making its earlier proposals. *See supra* p. 19. Nothing about that course of events supports an inference of bad faith conduct or abdication on the part of the Board.

In addition to challenging the Board's purportedly conflicted advisors, Plaintiffs attempt to second-guess the Board's independent decision-making under the guise of bad faith. Plaintiffs identify a number of supposed process failures, none of which support a reasonable inference of bad faith. *See, e.g.*, *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *7 (Del. Ch. Sep. 30, 2009) (explaining that allegations "that the Board's process was not perfect" do not demonstrate bad faith). For instance, Plaintiffs argue that the Director Defendants "facilitated and rushed to accept Bain's underpriced offer instead of seriously exploring (or even soliciting) other feasible superior bids." AB at 67. According to Plaintiffs, "the Board failed to run a real process," "ran no auction[,] and did not even solicit alternative bidders." *Id.* at 68. Again, the factual allegations of the Complaint refute this argument. As alleged, *Reuters* and *Bloomberg* publicly reported that the Company was considering strategic alternatives; the Company separately ran a process to sell the D&A

47

Business in which it contacted 80 potential bidders; and the Board ultimately received two unsolicited bids to acquire the Company. *See supra* pp. 5, 9–11. The Board also considered a pre-signing market check, but after considering widespread news of its process, the risk of additional delay, and "strong feedback" from FNZ and Bain rejecting a go-shop provision, it decided instead to negotiate a low break fee. *See supra* p. 14. That decision, made by a fully independent Board, is not inexplicable, without the bounds of reason, or otherwise indicative of bad faith.

Plaintiffs argue that the Board acted in bad faith because it "never seriously considered pursuing FNZ's bid." AB at 71. That argument is conclusory and unsupported by the factual allegations of the Complaint. Plaintiffs also argue that the Board acted in bad faith because "[t]he Merger price fell below market analysts' $64.57 average price target for the standalone Company and the $70.63 midpoint of Morgan Stanley's DCF analysis." *Id.* at 72. Decades of cases in Delaware have held that a plaintiff cannot plead bad faith simply by pointing to a supposedly insufficient merger price. *See, e.g.*, *Essendant*, 2019 WL 7290944, at *14 ("[C]riticizing the price at which a board agrees to sell a company, without more, does not a bad [] faith claim make."); *In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *7 (Del. Ch. Sep. 29, 2005) ("Nor is the fact that the final price per share was below the market price on the day of sale enough to rebut the business judgment presumption.").

48

In short, the factual allegations of the Complaint paint a picture of a fully independent Board retaining experienced advisors, informing itself of potential conflicts, engaging with multiple bidders, and meeting over a dozen times before reaching a deal. "The process pursued by the Director Defendants that is reflected in the Complaint, considered as a whole and taking as true the well-pleaded allegations of fact, provides no support for any inference of bad faith . . . ." *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 729 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

\* \* \*

Because the Complaint fails to plead facts supporting a reasonable inference that the Director Defendants breached a non-exculpated duty, Counts I and II of the Complaint must be dismissed, even if *Corwin* does not apply.

### 2. The Complaint Fails To State An Aiding And Abetting Claim Against Morgan Stanley.

Count III of the Complaint alleges a claim against Morgan Stanley for aiding and abetting breach of fiduciary duty.

To state a claim for aiding and abetting under Delaware law, Plaintiffs must allege: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in the breach by the defendants, and (4) damages proximately caused by the breach." *In re Mindbody, Inc. S'holder Litig.*, 332

49

A.3d 349, 389 (Del. 2024) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

The Complaint fails to allege a non-exculpated claim for breach of the duty of loyalty against the Director Defendants. *See supra* Part II.B.1. The Delaware Supreme Court has held that an aiding and abetting claim also may be premised on an exculpated claim for breach of the duty of care. *See RBC Cap. Mkts.*, 129 A.3d at 862 ("[I]f the third party knows that the board is breaching its duty of care and participates in the breach by misleading the board or creating the informational vacuum, then the third party can be liable for aiding and abetting." (citation omitted)). Count III still must be dismissed because the Complaint fails to allege any breach of the duty of care in which Morgan Stanley "knowingly participated."

As recent authority from the Delaware Supreme Court makes clear, knowing participation is "difficult to prove and involves two distinct concepts that are sometimes analyzed separately: knowledge and participation." *Mindbody*, 332 A.3d at 390. Pleading "knowledge" requires allegations supporting an inference that the alleged aider and abettor "know[s] that the primary party's conduct constitutes a breach" and knows that "its own conduct regarding the breach was legally improper." *Id.* at 390–91 (emphasis omitted). Pleading participation requires allegations "that the aider and abettor provide[d] 'substantial assistance' to the primary violator." *Id.* at 392.

50

Plaintiffs do *not* argue that Morgan Stanley aided and abetted the Director Defendants' alleged disclosure breaches. Instead, Plaintiffs premise their aiding and abetting claim on myriad purported sales process violations. The Director Defendants' alleged care breaches include (1) hiring conflicted advisors, (2) permitting Morgan Stanley to have "unsupervised discussions with bidders," (3) permitting Morgan Stanley to impose a timeline on bids, (4) permitting Morgan Stanley to give GTCR inadequate access to diligence and management, (5) accepting Morgan Stanley's "pretextual reasons for discrediting the other bidders," and (6) accepting Morgan Stanley's valuation.

Morgan Stanley did not aid and abet the Board's decision to hire purportedly conflicted advisors. Morgan Stanley provided the Board with five relationship disclosures in which it disclosed its representations and interests regarding Bain, GTCR, and FNZ. *See supra* pp. 7–8, 12, 17, 21–22. After making appropriate disclosures, Morgan Stanley had no reason to know that the Director Defendants' decision to retain it "constitute[d] a breach," or that its agreement to serve as the Company's financial advisor was "legally improper." *Mindbody*, 332 A.3d at 390–91. Boards have broad discretion to use their business judgment to weigh the risks of potential conflicts and select advisors they believe will maximize value for stockholders. *See, e.g.*, *In re Zale Corp. S'holders Litig.*, 2015 WL 6551418, at *5 (Del. Ch. Oct. 29, 2015) (rejecting a challenge to the retention of a purportedly

51

conflicted advisor); *In re Inergy L.P.*, 2010 WL 4273197, at *14–15 (Del. Ch. Oct. 29, 2010) (same). Moreover, simply "having a conflict" is not wrongful. *See In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *20 (Del. Ch. Oct. 12, 2011) (explaining that "[a] conflict of interest . . . is not wrongdoing itself").

Morgan Stanley similarly had no reason to know that any other aspect of the Board's conduct in running the sales process—approving a premium deal after engaging with multiple bidders over several months—constituted a breach. Nothing about the way the process allegedly unfolded supports "clear and direct knowledge" of a fiduciary breach. *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324, 356 (Del. 2025).

Plaintiffs argue that Morgan Stanley "steered" or "tilted" the sales process to Bain, but the Complaint does not even support a reasonable inference that Morgan Stanley had a financial incentive to do so. Not only did Morgan Stanley's contingent fee incentivize it to maximize price,[18] but Morgan Stanley also had similar relationships with both GTCR and FNZ. *See supra* pp. 12–13. As of May 20 (more than halfway through the sales process), Morgan Stanley had earned the same

---

[18] Though Plaintiffs also take issue with the incentive fee structure, this Court has "reject[ed] [the] proposition that the Court may infer that a financial advisor knowingly participated in a breach of fiduciary duty merely because the advisor negotiated a fee structure that incented it to assist its client in reaching the goal of a consummated transaction." *Tilden v. Cunningham*, 2018 WL 5307706, at *18 (Del. Ch. Oct. 26, 2018).

amount in fees from GTCR as from Bain. *See supra* pp. 12–13. But even assuming Morgan Stanley had an incentive to favor Bain over its other clients, the Complaint still fails to allege that Morgan Stanley took any action without Board direction or approval *or* concealed information from or otherwise misled the Board.

Plaintiffs argue that Morgan Stanley had "unsupervised discussions with bidders." AB at 81; Compl. ¶ 162 (alleging the Board "permitted" Morgan Stanley to "privately handle" bidder communications). Beyond unsupported supposition, however, they do not allege that misconduct occurred during those discussions.[19] Plaintiffs claim that Morgan Stanley improperly "impose[d] a timeline" on bids, but the only reasonable inference to be drawn from the Complaint and the documents incorporated by reference therein is that the Board, not Morgan Stanley, made that decision.[20] Compl. ¶ 93; DX 17 at 3. It is not reasonable to infer that setting a

---

[19] Plaintiffs ask the Court to infer that Morgan Stanley tipped Bain because Bain "reduced its bid once th[e] [other] bidders withdrew or reported they were unable to proceed." AB at 81. That is not a reasonable inference in my view. As alleged, FNZ's message that it would require additional time to secure financing and Bain's reduced offer followed significantly diminished second-round bids for the D&A Business, and in either event, FNZ submitted a revised bid just days later. *See supra* pp. 16–18.

[20] The Complaint alleges that "[t]he Board discussed its options" and "declined to conduct a pre-market check or insist on a go-shop[,]" "*the Board* directed" Morgan Stanley to set up meetings with bidders, "[t]he Board further determined" to permit the bidders to contact equity and debt financing sources, "[t]he Board imposed a deadline" for bidders to submit financing proposals, "[t]he Board directed Morgan Stanley" to ask bidders to submit final proposals by June 19, "[t]he Board expressed skepticism" at the other bidders' ability to finance a transaction, and "[t]he Board directed" Morgan Stanley to try to increase Bain's offer. Compl. ¶¶ 74, 79, 93–94 (emphasis added).

deadline for bids was grossly negligent, rather than an appropriate measure for managing the sales process, let alone that Morgan Stanley knew its participation in that decision was legally improper.

Plaintiffs allege that Morgan Stanley aided and abetted a breach of duty by giving GTCR inadequate access to diligence and management. But the Complaint alleges that immediately after receiving GTCR's June 12 letter, the Board met to discuss the letter, "reviewed in detail" with Morgan Stanley "the amount of information and access to members of Company management that had been provided to [GTCR] compared to [Bain] and [FNZ]," and directed Paul, Weiss (not Morgan Stanley) to communicate with GTCR to better understand its concerns. *See supra* pp. 15–16. The Complaint does not support an inference that the Director Defendants acted in a grossly negligent manner, and Morgan Stanley could not aid and abet a breach that did not occur.[21]

Plaintiffs also allege that Morgan Stanley gave the Board "pretextual reasons for discrediting the other bidders," which the Director Defendants unwittingly

---

[21] Plaintiffs also allege that Morgan Stanley aided and abetted a breach of fiduciary duty by providing the Illustrative LBO Analysis to Bain before Morgan Stanley was engaged as the Company's financial advisor. This argument admittedly confounds me. Morgan Stanley could not have aided and abetted a breach of fiduciary duty that had not yet occurred, and the Director Defendants could not have breached a fiduciary duty in connection with a sales process that had not yet begun. Certainly, Morgan Stanley could not have known at that time that it was advancing a breach when it had not yet been retained.

accepted. AB at 84. This argument fails because the Complaint does not allege that Morgan Stanley misled the Board about any material facts, creating an informational vacuum that could lead the Director Defendants to breach their duty of care. The factual allegations of the Complaint show only that a fully independent Board received advice, weighed financing, regulatory, and other closing risks (including risks associated with bids conditioned on an uncertain sale of the D&A Business), and reached reasonable conclusions. This supports neither a breach of the duty of care nor an aiding and abetting claim.

In a similar vein, Plaintiffs argue that Morgan Stanley downwardly adjusted its valuation of the Company to steer a transaction to Bain. Again, Plaintiffs fail to identify any information hidden from the Board. As alleged, Morgan Stanley's valuation was adjusted after the Company received diminished second-round bids for the D&A Business, at the direction of the Board. *See* DX 20 at 2, 18. And, in any event, an "advisor revis[ing] its analysis during the course of its engagement in a manner that is supportive of a proposed transaction" does not on its own support "an inference of knowing participation." *Tilden*, 2018 WL 5307706, at *18.

Because the Complaint fails to state a claim against Morgan Stanley for aiding and abetting a breach of fiduciary duty, Count III of the Complaint is dismissed.

55

## III.    CONCLUSION

The Motions to Dismiss are granted.  Because the Merger was approved by a fully informed vote of the unaffiliated stockholders, *Corwin* compels dismissal. Even if it did not, the Complaint fails to allege that the undisputedly independent Board acted in bad faith or that Morgan Stanley aided and abetted any breach of fiduciary duty.  The Complaint is therefore dismissed.